UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                          CASE NO.

**BEN JOSEPH DEHLER**                           **17-19237**
**KAMI KAY DEHLER**

                                                SECTION A
DEBTORS                                         CHAPTER 7

**MARIVETTE MOUTON**                            ADVERSARY NO.
**GREGORY MOUTON**
                                                **17-1045**
PLAINTIFFS

VERSUS

**KAMI KAY DEHLER**

DEFENDANT

## MEMORANDUM OPINION

Trial in the above-captioned adversary proceeding came before the Court on July 24 and 25, 2018.  At the conclusion of trial, the Court ordered the parties to submit simultaneous post-trial briefs no later than September 21, 2018.  Upon the submission of the briefs, the matter was taken under advisement.

**I.  Facts**

Kami Kay Dehler ("Dehler") is a naturopathic practitioner.  She is also certified to practice midwifery in Oregon and Louisiana.[1]

---

[1] P-56, Tr.T. 7/24/18, pp. 247 and 255.

Dehler participated in approximately 50 births in Oregon and 50 in Louisiana.  In three cases, the mother was transported to a hospital for delivery by cesarean section.[2]

Dehler moved to Louisiana in 2003 and was issued her Louisiana license to practice midwifery on May 18, 2004.[3]

Under Louisiana law, a midwife must have a patient certified by an obstetrician-gynecologist ("ob-gyn") as low to normal risk before accepting the patient for at home delivery.[4]  An ob-gyn must also agree to support the midwife during delivery in case of unforeseen problems or the need for consultation.[5]

Dehler was aware of both of these requirements but chose to "ride under the radar"[6] because she could not find physicians who would provide back up assistance.[7]

Prior to the Mouton delivery, Dehler assisted in two births which resulted in fetal demise.[8] Neither woman was over age 40, and neither labor was prolonged.[9]

---

[2] P-56, Tr.T. 7/24/18, p. 249, l. 24 - P. 250, l. 1; p. 254, ll. 18-22.

[3] *See* Exh. 5.

[4] La. Admin. Code 46:XLV.5311 and 5361 (2006).  The Court will refer to the La. Admin. Code effective in 2006.

[5] La. Admin. Code 46:XLV.5315(4) and (5) (2006).

[6] P-56, Tr.T. 7/24/18, p. 275, l. 17.

[7] *Id.* at p. 275, l. 10 - p. 277. l. 6.

[8] *Id.* at p. 258, ll. 5-8.

[9] *Id.* at p. 258, ll. 1-10.

2

The Moutons found Dehler through an internet search.[10] Marivette Mouton ("Mouton") was 41 years old and was expecting her first child.[11] The Moutons met with Dehler in April 2006, when Mouton was about 2 months pregnant.[12]

Dehler advised the Moutons that a visit with an ob-gyn was a prerequisite to home delivery and referred them to Dr. Lapeyrolerie.[13]

Dr. Lapeyrolerie examined Mouton, performed a pap smear, drew blood and recommended a genetic test due to Mouton's age.[14] Dr. Lapeyrolerie refused to serve as their back up physician due to their location.[15]   Mouton chose not to receive genetic testing.[16]

Dehler received neither verbal nor written assurance from Dr. Lapeyrolerie concerning Mouton's condition or risk rating.[17]

Neither Dehler nor Mouton received the results from tests performed by Dr. Lapeyrolerie. Dehler determined on her own that Mouton was eligible for home birth.[18]

---

[10]  *Id.* at p. 95, ll. 18-20.

[11] *Id.* at p. 107, ll. 1-4.

[12] *Id.* at p. 96, ll. 4-9.

[13] *Id.* at p. 97, ll. 20-24.

[14]*Id.* at p. 146, ll. 6-14.

[15] P-58, p. 2.  Louisiana law requires the backup physician be within 50 miles of the patient's home in case it is necessary to attend the birth.

[16]  P-56,  Tr. T. 7/24/18 p. 147, ll. 9-11.

[17] *Id.* at p. 278, l. 15 - p. 279, l. 13.

[18] *Id.* at  p. 279, ll. 14-17.

In September 2006, Dehler and Karen Henshaw ("Henshaw") went to the Moutons' home. Henshaw was an apprentice mid-wife,[19] and Dehler was her supervisor.[20]  Dehler and Henshaw examined Mouton by taking her blood pressure, pulse, weight, and measuring her abdomen.  No vaginal examination was performed.[21]  They inspected the home for suitability for child birth.[22]

Without physician support, Dehler planned on transporting Mouton to the nearest hospital in case of emergency.[23]

At 5:00 a.m. on October 23, 2006, Mouton's amniotic sac ruptured and Dehler was called.[24] Dehler and Henshaw arrived at 10:00 a.m. when contractions were 15 to 20 minutes apart and less than 60 seconds long.[25]  No vaginal examination was performed.[26]

Approximately twenty-four hours later, at 5:00 a.m. on October 24, 2006, contractions were 8 to 10 minutes apart.[27]  Mouton was not comfortable with Dehler or Henshaw performing a vaginal

---

[19] Henshaw is also a certified childbirth educator and birth doula. P-56,  Tr. T. 7/24/18 p. 172, ll. 13-19.

[20] *Id.* at p. 173, ll. 8-10.

[21] Both Dehler and Henshaw testified that mid-wives do not perform vaginal examinations unless there is a problem. P-56,  Tr. T. 7/24/18 p. 180, ll. 2-3; P-57, Tr. T. 7/25/18 p. 23, ll 4-9.

[22] P-56,  Tr. T. 7/24/18 p. 224, ll. 16-19.

[23] Ochsner Hospital was closer.

[24]  P-56,  Tr. T. 7/24/18 p. 113, ll. 6-9.

[25] *Id.* at p. 114, ll. 22-24; p. 185, ll. 17-19; p. 191, ll. 7-9; p. 194, ll.7-8.

[26] *Id.* at p. 190, ll. 13-20.

[27] *Id.* at p. 194, ll. 12-14.

examination, so Mr. Mouton performed one with Dehler coaching him.[28]  Marivette's cervix was dilated approximately four centimeters.[29]

Henshaw monitored the baby's heart rate periodically with a fetoscope.[30]

After 36 hours of labor or at approximately 5:00 p.m. on October 24,2006, Dehler and Henshaw could not detect the baby's heart rate and requested permission to use a dopplar fetal monitor.[31]   The Moutons refused.[32]

At approximately 2:00 a.m. on October 25, 2006 or 45 hours into labor, Dehler insisted on using a dopplar monitor to find the baby's heartbeat.[33]

Dehler never suggested that Mouton be transported to a hospital. The Moutons did not ask to go to the hospital.[34]

---

[28] *Id.* at p. 197, l. 15 - p. 198, l. 10; P-57, Tr. T. 7/25/18 p. 24, ll 9-12.

[29] P-57, Tr. T. 7/25/18 p. 26, l. 3.

[30] P-56, Tr. T. 7/24/18 p. 190, ll. 2-3.

[31] *Id.* at p. 199, ll. 11-12.

[32] *Id.* at p. 199, ll. 1l. 12-14;  P-57, Tr. T. 7/25/18 p. 21, ll. 3-10.

[33] P-57, Tr. T. 7/25/18 p. 30, l. 21 - p. 31, ll. 19.

[34] Mr. Mouton testified that he asked Dehler if they should go to the hospital.  Both Dehler and Henshaw testified that neither of the Moutons mentioned going to the hospital, and the Court finds the testimony of Dehler and Henshaw most credible.

5

Mouton gave birth on October 25, 2006, at 11:00 a.m., after approximately 53 hours of labor.[35]  The baby was alive but unresponsive and not breathing. Dehler performed CPR while Henshaw called 9-1-1.[36]

When an ambulance arrived, emergency medical technicians intubated the baby and she was transported to a local hospital.[37]  After arriving, no brain activity could be detected, she was taken off life support on November 4, 2006 and passed away.[38]  The cause of death was listed as hypoxic ischemic encephalopathy ("HIE").[39]

On October 15, 2007, Dehler's midwifery license was suspended for a period of thirty days in a matter unrelated to the Moutons.[40]  On March 5, 2008, her license was suspending indefinitely pending final decision in the Mouton birth.  Her license was revoked on June 16, 2008, based on her involvement with the Moutons.[41]

The Moutons filed suit against Dehler in the 19th Judicial District Court, Parish of East Baton Rouge.[42]  A nonjury trial was held in January 2017.[43]  The Court orally rendered a decision on

[35] P-56, Tr. T. 7/24/18 p. 165, l. 1.

[36] *Id.* at p. 215, ll. 1-8.

[37] *Id*. at p. 128, l. 22.

[38] Exh. 20.

[39] *Id.*  HIE is brain injury that occurs when the brain is deprived of oxygen.

[40] Exh. 6.

[41] Exh. 9.

[42] *Mouton v. Dehler*, case no. C588,217, 19th Judicial District Court, Parish of East Baton Rouge.

[43] Exh. 10.

6

January 24, 2018, and on February 8, 2017, written Judgment was entered in favor of the Moutons and against Dehler in the amount of $600,000 ("Judgment").[44]

On January 31, 2017, Ben and Kami Dehler filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. The deadline for objecting to discharge was set as May 1, 2017.[45]

On May 1, 2017, the Moutons filed a Motion to Extend Time to Object to Discharge.[46] The Court extended the deadline to object to discharge to June 30, 2017.[47]

On June 29, 2017, the Moutons filed Proof of Claim 1 in the total unsecured amount of $600,000 based on the Judgment and a Complaint objecting to the dischargeability of the Judgment under 11 U.S.C. § 523(a)(6).

## II. Law and Analysis

The Moutons seek to have the Judgment rendered nondischargeable under 11 U.S.C. §523(a)(6). Although the Moutons' claim against Dehler is based on a state court Judgment, "the determination of whether a debt is nondischargeable under [section 523 is] a matter of federal bankruptcy law."[48]

---

[44] *Id.* The Judgment awards the Moutons $300,000 for survival action damages and $300,000 for wrongful death. Because Judgment was orally rendered prepetition, entry of written Judgment postpetition did not violate the automatic stay. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527-528 (2nd Cir. 1994). Dehler does not contend that the stay was violated.

[45] Case no. 17-10237, P-4.

[46] Case no. 17-10237, P-16.

[47] Case 17-10237, P-23.

[48] *Matter of Dennis*, 25 F.3d 274, 277 (5th Cir. 1994).

7

Section 523(a)(6) excepts from discharge debts incurred due to "willful and malicious injury" inflicted by the debtor. "To prevail under § 523(a)(6), a creditor must prove by a preponderance of the evidence that the debt is nondischargeable."[49]

## A. Law and Jurisprudence

"[T]o be nondischargeable, the judgment debt must be 'for willful and malicious injury.'...[D]ebts arising from reckless or negligently inflicted injuries do not fall within §523(a)(6)'s compass."[50]

> The classic case for application of the willful and malicious injury exception to discharge under 11 U.S.C.A. § 523(a)(6) seems to arise when the debtor intentionally injures a creditor and the creditor seeks to make non-dischargeable a judgment won in state court tort action." Cases involving injuries stemming from assault, the debtor's obligation to a former employee for sexual harassment, libel, fraudulent inducement of a patient to submit to surgery where the debtor represented himself to be a doctor, and injuries as a result of the debtor's drag racing, for example are typical debts excepted from discharge under this subsection.[51]

Section 523(a)(6) includes intentional torts, but not exclusively or completely.[52] As the Supreme Court explained,

> The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely... a deliberate or intentional *act* that leads to injury.[53]

---

[49] *In re Cantu*, 389 Fed.Appx. 342, 345 (5th Cir. 2010) (quoting *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005)).

[50] *Kawaauhau v. Geiger*, 523 U.S. 57, 63-64,118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998).

[51] *In re Benasco*, 2013 WL 2949138, *5 (Bankr.E.D.La. 2013) (citing AMJUR Bankruptcy § 3656; *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); and *In re Miller*, 156 F.3d 598 (5th Cir. 1998)).

[52] *Id.*

[53] *Kawaauhau,* 523 U.S. at 61.

8

Thus, even if the act was intentional, but the injury was not "desired or anticipated," it is not a "willful and malicious injury."[54]  This distinction may not always be apparent.

In *Miller v. J.D.Abrams, Inc.*,[55] an employee was privy to proprietary information and trade secrets regarding management policies, customer lists, pricing and bidding strategies, profit margins and cost projections.  He purposefully disclosed them to a competitor who offered him a position in his company.  A jury found Miller misappropriated proprietary information and misused trade secrets, awarding his former employer damages of $1 million.  However, the jury declined to award punitive damages because they found that Miller did not act with malice.  Miller filed for bankruptcy relief and his employer objected to the dischargeability of the judgment.

The employer argued that since the misappropriation and disclosure was willful, the damages must be nondischargeable.  The Court of Appeals for the Fifth Circuit disagreed.  Rejecting the notion that §523(a)(6) applied to all intentional torts, the Circuit Court held:

> We hold that the label 'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury.  Rather, either objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful...injury' in §523(a)(6).
>
> *            *            *
>
> Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful.  This case illustrates the distinction, since misappropriation of proprietary information and misuse of trade secrets are wrongful regardless of whether injury is substantially certain to occur.  *See, e.g.*, Restatement (Third) Unfair Competition §40(b) cmt. ...Misuse of trade secrets is not precisely like stealing funds from a till, because the tortfeasor's gain is not inevitably a loss to the legal owner of the secret.[56]

---

[54] *Id.* at 62.

[55]  *Miller v. J.D.Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).

[56] *Id.* at 603-04.

9

Referencing an earlier holding by the Fifth Circuit in *In re Delaney,*[57] the Circuit Court found:

> "[F]or willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted" and not just performed an intentional act that resulted in injury.[58]

The Court also noted that malice may be implied, as "[m]alice inferred by legal reasoning and necessary deduction from the res gestae or the conduct of the party."[59]  Synthzing its reasoning, the Circuit Court pronounced the standard was met when either an objective substantial certainty of harm or a subjective motive to cause harm existed.   Both parts of this concept hinge on a determination that the injury was intended.  The first prong assumes intent to cause injury when a third party can objectively conclude that harm would occur.  For example, someone is pushed out of a window.  It may be argued that the perpetrator did not intend to kill the victim; however, there is such a objective and substantial certainty of injury. His intent to injure can be implied.  The second prong or subjective motive is when actual intent to cause injury is present.

Because the jury in *Miller* concluded that he lacked an intent to cause injury, the Circuit held the judgment dischargeable.

*In re Williams,*[60]  provided the Fifth Circuit with another opportunity to further explain its holding in *Miller*.  Williams was a non-Union electrical contractor who only employed non-union

---

[57] *Corley v. Delaney (In re Delaney)*, 97 F.3d 800, 802 (5th Cir.1996).

[58] *Miller,* 156 F.3d at 603 (quoting *Delaney*, 97 F.3d at 802).

[59] *Miller,* 156 F.3d at 605.

[60] *Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams),* 337 F.3d 504 (5th Cir. 2003).

10

electricians.  After being sued by the local Union, he entered into a collective bargaining agreement requiring him to 1) use the Union employees; 2) pay Union wages; and 3) contribute to the Union pension for all Union employees.  Shortly after signing the Collective Bargaining Agreement ("CBA"), Williams hired non-Union employees and paid them a prevailing wage rather than the Union wage.  The Union sued claiming breach of the CBA and obtained a judgment.  Williams filed for bankruptcy relief, and the Union sued again, this time for nondischargeability.

The Fifth Circuit found that Williams intentionally breached the CBA.  However, it could not find any evidence that the damages awarded were intentionally inflicted.  With regard to the Union's claim that non-Union electricians were employed and not paid the prevailing wage,  the Court concluded that while Union members lost an opportunity to work and non-Union electricians were denied a higher wage,  the Union itself did not suffer.  The same was made regarding Williams' failure to contribute to a Union pension that non-Union employees could not join.

Finally, the Union argued that its reputation and authority were damaged by Williams' breach.  While the Court did not argue the point, it found nothing in the record to support a finding that Williams intended the reputation of the Union be damaged or that he would have recognized a substantial certainty that this might occur.  Citing *Kawaanhau*, the Circuit Court rejected a standard that would make debts from intentional acts that cause unintentional or unanticipated injuries nondischargeable. Finding that exceptions to discharge should be "confined to those plainly expressed."[61]

*Williams* illustrates that the debtor must intend the specific injury or be aware that chances of its occurrence are substantial.  It does not matter that the injury occurs or that it was foreseeable.

---

[61] *Id.* at 509.

The perpetrator must intend for it to occur or be aware of that the likelihood of damage is substantially certain. The Legislative History of section 523(a)(6) establishes that Congress did not intend for injury caused by "reckless disregard" to be"willful and malicious."[62]

> Under [section 523(a)(6)], 'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473 (1902), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled.[63]

Based on Legislative History and jurisprudence, the Court finds that negligence and gross negligence are not "willful and malicious."[64]

Because debtors generally deny that they had a subjective motive to cause harm, most cases focus on whether "[the debtor's] actions were at least substantially certain to result in injury."[65]

"Objective substantial certainty requires that from a third party's point of view, the actions were at

---

[62] *See also In re Stanley*, 224 Fed.Appx. 343, 348 (5th Cir. 2007) (a finding of reckless disregard is not in the scope of section 523(a)(6)).

[63] H.R. Rep. 95-595, 95th Cong., 1st Sess. 365 (1977); S. Rep. No. 95-989, 95th Cong. 2d Sess. 79 (1978). In *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505 (1904), the Court held that "criminal conversation" was nondischargeable because it was intentional and "without just cause or excuse," even if done "without any particular malice" toward the husband. *Id.* at 485, 487.

[64] *See also First Louisiana Business and Industrial Development Corp. v. Dyson (In re Dyson)*, 277 B.R. 84 (Bankr.M.D.La. 2002), and *Friend v. Provenza (In re Provenza)*, 316 B.R. 177, 221 (Bankr.E.D.La. 2003).

[65] *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed.Appx. 360, 361 (5th Cir. 2007).

least substantially certain to cause harm."[66] "Substantial certainty must be adjudged at the time of the action or inaction."[67] Examples of the fact based analysis and often conflicting holding follow.

In *Corley v. Delaney (Matter of Delaney)*,[68] Corley was sitting in a vehicle in Delaney's driveway. Delaney tapped a loaded gun on the windshield of the vehicle. The gun accidentally discharged, injuring Corley. The Court found that while Delaney intended the act of tapping a loaded gun on the windshield, he did not intend the injury. The firing of the gun "was wholly unintentional, even though possibly not wholly unforeseeable. ... He neither intended the injury nor took action that was "substantially certain" to cause the injuries that Corley suffered."[69]

In *Red v. Baum (In re Red)*,[70] Red was driving a vehicle which veered across traffic after hitting another vehicle and crashed into a bar, killing two people and injuring several. The Fifth Circuit upheld the Bankruptcy Court's finding "that Red did intentionally commit an action - driving into a crowded bar - that was "substantially certain" to cause harm."

---

[66] *Dufrene v. Paille (In re Paille),* 2009 WL 3199187, *2 (Bankr.E.D.La. 2009) (Expert disagreement as to substantial certainty of harm meant that reasonable minds could differ, and the test was not met.).

[67] *Weatherall Radiation Oncology v. Caletri (In re Caletri)*, 517 B.R. 655 (Bankr.E.D.La. 2014) (citing *In re Harwood*, 404 B.R. 366 (Bankr.E.D.Tex. 2009), *aff'd*, 427 B.R. 392 (E.D.Tex. 2010), *aff'd*, 637 F.3d 615 (5th Cir. 2011)).

[68] *Delaney (Matter of Delaney)*, 97 F.3d 800 (5th Cir. 1996). In *Miller*, the Fifth Circuit stated that *Delaney* is still good law "because the Supreme Court in no way contradicted it [in *Kawaauhau*]." *Miller*, 156 F.3d at 604.

[69] *Delaney*, 97 F.3d at 802-803.

[70] *Red v. Baum (In re Red)*, 96 Fed.Appx. 229 (5th Cir. 2004).

13

In *Caton v. Trudeau (Matter of Caton)*,[71] the Fifth Circuit found that libelous statements caused willful and malicious injury because they were "objectively substantially certain to result in injury."

In *Berry v. Vollbracht (In re Vollbracht)*,[72] Vollbracht punched Berry several times causing injury. Vollbracht was convicted of simple assault in Mississippi state court. Berry sued Vollbracht for civil damages,[73] and Vollbracht filed a Voluntary Petition for Bankruptcy Relief. Berry filed an adversary proceeding contending that any damages were nondischargeable. The Bankruptcy Court found that Vollbracht did not intend to harm Berry but failed to address whether the punches were objectively substantially certain to cause harm. The Fifth Circuit found: "Vollbracht's haymakers, like most garden-variety punches to the face, are objectively very likely to cause harm."[74] Nevertheless, the Fifth Circuit remanded on the issue of self-defense, finding that sufficient justification could avoid an injury being willful and malicious.

In *Shcolnik v. Rapid Settlements Ltd. (In re Shcolnik)*,[75] Shcolnik, a former employee of Capstone Associated Services ("Capstone") and Rapid Settlements Ltd. ("Rapid"), threatened Capstone and Rapid with disclosure of regulatory and criminal violations if they did not pay him for an alleged ownership interest. An arbitrator held that Shcolnik had no ownership interest and awarded $50,000 in attorneys' fees to Capstone and Rapid. The state court confirmed the award.

---

[71] *Caton v. Trudeau (Matter of Caton)*, 157 F.3d 1026, 1030 (5th Cir. 1998).

[72] *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed.Appx. 360 (5th Cir. 2007).

[73] Berry obtained a default judgment, but it was later set aside.

[74] *Id.* at 362.

[75] *Shcolnik v. Rapid Settlements Ltd. (In re Shcolnik)*, 670 F.3d 624 (5th Cir. 2012).

Shcolnick filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code.  Rapid and Capstone filed a Complaint objecting to the dischargeability of the attorney fee award. The parties filed Motions for Summary Judgment.

The Fifth Circuit held that if Shcolnik desired to inflict the expense of litigating a meritless claim, or it was substantially certain to result, the injury was "willful and malicious." Because there was a genuine issue of material fact, summary judgment was denied, and the case was remanded for trial.

In *Goaz v. Rolex Watch U.S.A. Inc. (In re Goaz),*[76] the debtor knowingly sold counterfeit Rolex watches. The Fifth Circuit held that selling counterfeit watches was objectively substantially certain to cause harm to Rolex.

In *Zimmerman v. Seuzeneau (In re Seuzeneau)*,[77] this Court found that a contractor's failure to return to a  construction  job after final payment was received, even though the job was unfinished, was substantially certain to cause harm.

In *Cole v. Parson (In re Cole),*[78] Dr. Cole performed back surgery on Mr. Parson to take out a disc in order to relieve pain.  During surgery, the disc was found to be normal but was still removed as planned.  The surgery did not relieve Mr. Parson's back pain, and subsequent physicians told him that the surgery performed by Dr. Cole was unnecessary.  Mr. Parson sued Dr. Cole in state court for malpractice and was awarded $300,800.  Dr. Cole filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court held the judgment nondischargeable under section

---

[76] *Goaz v. Rolex Watch U.S.A. Inc. (In re Goaz)*, 559 Fed.Appx. 377 (5th Cir. 2014).

[77] *Zimmerman v. Seuzeneau (In re Seuzeneau)*, 2011 WL 6258306 (Bankr.E.D.La. 2011).

[78] *Cole v. Parson (In re Cole),* 225 B.R. 625 (N.D.Texas 1998).

523(a)(6). The District Court affirmed finding that performance of the unnecessary surgery resulted in willful and malicious injury.

### B. Analysis of This Case

The Louisiana State Board of Medical Examiners is statutorily charged with the licensing and regulation of midwives.[79] Midwives may only accept clients who are low to normal risk patients.[80] Before accepting a client, the client's risk must be assessed by a physician:

> The licensed midwife practitioner must require that the client have a physical examination by a physician and be found to be essentially normal or at low risk before her care can be assumed. ...[81]

Midwives are also tasked with risk assessment of potential clients:

> All midwives will use risk factor assessments of their clients in order to establish their initial and continuing eligibility for midwifery services. Clients will be informed of their risk status. All midwives have the right and responsibility to refuse and discontinue services to clients based on these risk factors and to make appropriate referrals when indicated for the protection of the mother and baby. All final decisions on risk factors will be made by the midwife and the client's backup physician.[82]

Midwives are prohibited from accepting certain clients:

---

[79] La. R.S. § 37:3243.

[80]

The licensed midwife may provide care to low risk patients determined by physician evaluation and examination to be prospectively normal for pregnancy and childbirth, and at low risk for development of medical complications. Licensed midwife practitioners shall provide such care with the supervision of a physician who is actively engaged in the practice of obstetrics.

La. Admin. Code 46:XLV.5301 (2006). *See also* La. Admin. Code 46:XLV.5361(A) (2006).

[81] La. Admin. Code 46:XLV.5311 (2006). *See also* La. Admin. Code 46:XLV.5361(A).

[82] La. Admin. Code 46:XLV.5309 (2006).

A.  The licensed midwife practitioner shall provide care only to clients determined to be at low or normal risk of developing complications during pregnancy and child birth by a supervising physician.

B.  The midwife shall not knowingly accept or thereafter maintain responsibility for the prenatal or intrapartum care of a woman who:

\*                    \*                    \*

19. is younger than 16 or a primipara[83] older than 40.[84]

Midwives must make certain disclosures prior to agreeing to a home birth:

A.  Prior to the acceptance of a client for care, a licensed midwife practitioner shall inform the client orally and in writing of the following disclosures:

1. certain risks and benefits exist for home birth and certain risks and benefits exist for other childbirth alternatives, (including hospital, physician-assisted birth).  The midwife is responsible for informing the client of the risks and benefits of all childbirth options to ensure informed consent;

2. regular antepartum care is required if the midwife is to attend the birth;

3.  certain medical conditions and/or client noncompliance with the midwife or physician recommendations may preclude midwife attendance at birth or continued midwife care during any phase of the pregnancy;

4. the client must make arrangements for the services of a backup physician located within a 50 mile radius of the client's home and the planned delivery site;

5. the midwife will develop and implement a plan for obtaining consultation from and/or referral to the client's backup physician, and will consult with the client's backup physician or transfer the client when necessary;

6. emergency transport may be required in certain situations; when situations warrant emergency transport and the hazards involved;

\*                    \*                    \*

_____

[83] "Primipara" means giving birth for the first time.

[84]  La. Admin. Code 46:XLV.5361 (2006).

9. the midwife's agreement can be terminated at any time that the midwife deems it necessary for maintenance of the client's mental and physical safety...

B.  Prior to accepting care for a client, the midwife shall consult with the physician who performed the medical evaluation to ensure that the client is at low or normal risk for pregnancy.

C.  After accepting care, the midwife shall obtain a detailed obstetric and medical history of the client; including the results of all tests conducted during the medical evaluation.[85]

Midwives are required to consult with a physician during labor in certain instances:

B.  The midwife shall obtain medical consultation or refer for medical care any woman who during the intrapartum period:

*          *          *

6.  has persistent or recurrent fetal heart tones below 100 or above 160 beats per minute between or during contractions, or a fetal heart rate that is irregular;

11. does not progress in effacement, dilation, or station after two hours in active labor (or one hour if distance to hospital is greater than one hour);

12. does not show continued progress to deliver after two hours of second state of labor (or one hour if distance to hospital is greater than one hour);

*          *          *

17. desires medical consultation or transfer.[86]

Mouton was primipara and over 40 years old.  Thus, Dehler was prohibited by La. Admin. Code 46:XLV.5361 (2006) from accepting her as a client.

---

[85]  La. Admin. Code 46:XLV.5315 (2006).

[86]  La. Admin. Code 46:XLV.5363 (2006).

While Dehler referred Mouton to Dr. Lapreyrolerie, Dehler did not consult with Dr. Lapeyrolerie regarding her risk assessment and did not obtain Mouton's test results as required by La. Admin. Code 46:XLV.5311 and 5361 (2006).

During labor, Dehler was required by La. Admin. Code 46:XLV.5363 (2006) to seek medical consultation when the baby's heart rate could not be found and when Mouton's labor failed to progress after two hours.  She did not do so.

The Moutons do not contend that Dehler subjectively intended to cause their child's death. Instead, they contend that the debt is nondischargeable because Dehler's actions were objectively substantively certain to result in their child's death.[87]

Mid-wifery continues as an occupation based on the belief that labor and delivery are a normal human activity.  As such, the body will perform normally without outside intervention or medical attention. Dehler subscribes to this understanding and avoids direct intervention in a birth at almost all costs.  She testified that unless there are observable symptoms of crisis or distress, she would not intervene.  Instead of using typical medical means to determine the progression of labor, Dehler observes the mother's behavior, intensity of contractions, and the urge to push.

There is no question that Dehler violated several provisions of the La. Administrative Code ("Code").  Her failure to obtain an ob-gyn's assessment of risk; have an ob-gyn on call for assistance during delivery; and failure to contact an ob-gyn when labor progressed beyond 24 hours and she could not hear a fetal heart rate all breached her duties under the Code.  Her transgressions resulted in the revocation of her license.  However, the question is not whether Dehler committed malpractice

---

[87] P-56; Tr. T. 7/24/18, p. 10, ll. 2-11.

19

or even gross negligence but whether her actions or inactions were substantially certain to cause injury to the baby.

In order to establish the substantial certainty of injury standard, the Moutons offered the testimony of Dr. Marshall St. Amant as an expert in maternal fetal medicine, obstetrics, gynecology, labor, and delivery. Dr. St. Amant testified that the medical standard for a "high risk" pregnancy is when the mother is age 35 years or older,[88] although in his opinion women ages 39 to 40 are definitely high risk.[89]

He also opined that labor lasting "between 20 and 24 hours" is "prolonged labor" as ninety percent of labors conclude before twenty hours."[90] The longer after 24 hours that labor continues "... should be a red flag that something wrong is going on"[91] and a dramatic increase to risk of fetal harm exists when labor lasts 53 hours.[92] In an effort to explain the reason for the increased risk, Dr. St. Amant explained that oxygen to the fetus is reduced during prolonged labor. Contractions cause placental deterioration, which in turn causes less oxygen to reach the fetus. Lower oxygen levels for prolonged periods lead to complications and injury, even death.

The Mouton baby died of hypoxic ischemic encephalopathy or decreased oxygen resulting in severe brain damage. The prolonged oxygen deprivation occurred due to the length of labor. This diagnosis was supported by the presence of dark amniotic fluid at the time of her birth, a sign of

---

[88] *Id.* at p. 33, l. 19.

[89] *Id.* at ll. 21-23.

[90] P-56, Tr.T. 7/24/18, p. 17, ll. 4-6.

[91] *Id.* at p. 19, ll. 13-15.

[92] *Id.* at p. 17, ll. 14-16.

oxygen deprivation and break down of placenta.[93]  In Dr. St. Amant's expert opinion,  Mouton should have been transported to a hospital after 24 hours of labor,[94] and had that been done, he believes that the baby had a 50% chance of survival.[95]

Dr. St. Amant testified that in his mind, substantial certainty means greater than 50%.[96]  He testified that Dehler's actions and inactions were substantially certain to result in the baby's death or serious injury.[97] However, he stopped short of guarantying that a baby born after 53 hours of labor would die.[98]

A. ... [T]he longer you go the increased morbidity, the more morbidity you have the

more likely it's going to add up to something that can take your life.

Q.  Is [ ] prolonged labor [ ] more likely than not by your definition, or [ ] substantial

by your definition [ ] likely to lead to injuries that you were just discussing?

A. Yes.[99]

It is clear that Dr. St.Amant believes no labor should extend beyond 24 to 27 hours if at all possible.  In his opinion, the risk of fetal morbidity or mortality increased with every quarter hour

---

[93] *Id*. at p. 28, l. 21 - p. 29, l. 3.

[94] *Id*. at p. 19, ll. 20-24; p. 20, ll. 14-16

[95] *Id*. at p. 45, ll. 8-10.  *See also id*. at p. 31, ll. 11-15.

[96] *Id*. at p. 63, l. 25 - p. 64, l. 3.

[97] *Id*. at p. 50, ll. 4-8.

[98] *Id*. at p. 66, l. 23 - p. 67, l. 6.

[99] *Id*. at p. 90, l. 19 - p. 91, l. 2.

21

beyond that time.  While the damage to the baby was "substantially certain" in Dr. St. Amant's opinion, the test is whether a midwife, specifically Dehler, would assume this to be the case.

Over the course of Dehler's career, she participated in over 100 births, several with prolonged labors or involving women aged 40 or older. She has experienced the loss of three babies.  In two of the births, the mothers were under 40 and labors were not prolonged.  Only in the Mouton case did these factors exist.  Thus, Dehler's personal experience would not have led her to assume or expect that prolonged labor or age of the mother might contribute to the demise of a child.

Dehler was a fervent believer in midwifery and the body's natural ability to deliver a healthy child without outside intervention.  She harbored a distrust of the medical community and in particular hospital births. When asked if she had ever insisted on transporting a patient to a hospital or contacted a physician for help during a delivery, she replied that three times she transported to the hospital.[100]  She reasoned:

> [M]y real philosophy is I believe God is the giver and creator of life and that he sustains life and that he gives us medical knowledge and personnel to help in emergency situations.  I 100 percent embrace the medical community as far as intervention when it's needed, c-sections when they're needed. ... [I]t was a balance because in Louisiana there was a over 50 percent c-section rate and so you're trying to avoid those c-sections for the health of the mother and the child ...[101]

Based on the Court's observation of Dehler, her demeanor on the stand and testimony it was evident that she does not believe the medical community adds any benefit over what she can provide a patient.  Her personal experience confirmed this belief.  In 99 births, two deaths occurred under

---

[100] *Id*. at p. 250, l. 23 - p. 251, l. 4.

[101] P-57, Tr. T. 7/25/18 p. 43, ll. 10 - 18.

circumstances dissimilar to the ones involving the Mouton birth and in each case she was cleared of any wrongdoing after inquiry.

In fact, Dr. St. Amant provided statistics for at home and hospital births.  In the case of at home deliveries, approximately 3.8 deaths occur out of 1000 births.[102]  Hospital deliveries cut that fatality rate to 1.9,[103] a rather small reduction unless you are the mother of the child that dies.

For these reasons, the Code allows home deliveries in only low to normal risk patients, requires a physician be on stand by during delivery, and a midwife consult with a physician if labor stalls after one or two hours.  Each of these requirements are designed to identify the three in 1000 patients at risk of delivering a stillborn child.  More to the point, they also guard against the development of severe injury or condition in either mother or child.

Nevertheless, the Court cannot conclude that Dehler either intended the Mouton baby to suffer severe harm or die.  Nor can it conclude that the death of the Mouton baby's  was an objective certainty since Dr. St. Amant and Dehler experienced healthy births even when labor was prolonged for many hours beyond 24.  Dehler's history of success with prolonged labor made her confident that the outcome would be positive, a belief the Court finds has support in the record.  So while the Court finds Dehler was exceptionally negligent in practice and probably reckless in her adherence to the parents' wishes, it does not find that she was willful or malicious.  "[S]ympathy and sense of fair play, however, do not a solid evidentiary foundation make as to subjective intent."[104]

---

[102] P-56, Tr. T. 7/24/18 p. 73, l. 16 - p. 74, l. 1.

[103] *Id.* at p. 73, ll. 11-12.

[104] *Northshore Neurological Surgery Assoc. v. Provenza (In re Provenza)*, 316 B.R. 177, 221 (Bankr.E.D.La. 2003).

### III.  Conclusion

For the reasons assigned above, the Court finds in favor of Dehler and against the Moutons.

The Court finds that the Moutons' claims against Dehler are dischargeable.

New Orleans, Louisiana, October 31, 2018.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge